# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CHRISTOPHER CARROLL,

      Petitioner,

                                   **Case No. 2:17-cv-380**

      v.                              **JUDGE JAMES L. GRAHAM**

                                   **Magistrate Judge King**

WARDEN, CHILLICOTHE
CORRECTIONAL INSTITUTION,

      Respondent.

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition* (Doc. 3), Respondent's *Return of Writ* (Doc. 5), and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### Facts and Procedural History

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> Separate attacks on two women in the Franklinton area, occurring approximately ten days apart in April 2013, resulted in appellant's indictment for multiple counts of rape, kidnapping, and associated specifications in two cases.[FN1] In the first case, involving victim J.L., appellant was indicted for one count of kidnapping, in violation of R.C. 2905.01 with a sexual motivation specification under R.C. 2941.147, one count of rape under R.C. 2907 .02 under an allegation of vaginal intercourse, and one count of rape under R.C. 2907.02 under an allegation of fellatio. In the second case, involving victim J.C., appellant was indicted for one count of kidnapping, in violation of R.C. 2905.01 with a sexual motivation specification under R.C. 2941.147, one count of rape under R.C. 2907.02 under an allegation of vaginal intercourse, one count of rape under R.C. 2907.02 under an allegation of fellatio, and one count of rape under R.C. 2907.02 under an allegation of anal

intercourse. All counts included a sexually violent predator specification pursuant to R.C. 2941.148. Appellant pled not guilty to all charges. The cases were consolidated, and all counts were tried to a jury from March 2 through 6, 2015 with the exception of the sexually violent predator specifications, which appellant elected to have tried to the court. Appellee, State of Ohio, produced the following relevant evidence in its case-in-chief.

FN1: The indictments also included counts that the state ultimately did not prosecute.

J.L. testified that appellant raped her in the early morning hours on April 8, 2013. At that time, J.L. was addicted to heroin and crack, and after an evening of taking drugs in the Franklinton area, left a drug dealer's house at approximately 4:30 a .m. to find more drugs. J.L. walked alone for a few blocks, making her way to Princeton Avenue near West Broad Street. There, appellant, driving a dark blue Cavalier with tinted windows, asked J .L. to get in his car. She replied no, and appellant continued to drive. J.L. was in an alley between South Princeton Avenue and Dana Avenue when appellant returned, pulling his car beside her so that she was a few feet from his passenger door. According to J.L., appellant exited his car, approached her from behind, put his arms around her, and forced her into the passenger seat of his car while wielding a box cutter with its blade exposed. Once in the car, appellant put his arm over her chest and grabbed her seatbelt in a way so that she could not move. J.L. was scared and thought he was going to kill her. Appellant drove north along Princeton Avenue until it terminated, made a right at railroad tracks, and parked outside of an abandoned house on Chicago Avenue.

J.L. testified that appellant reached over and put her seat all the way back, pulled her skirt up and underwear down, climbed on top of her with the box cutter, and choked her. With one of his knees in her stomach, J.L. testified appellant forced her to perform oral sex on him. Appellant then flipped her over and put his elbows in her back. Believing she would be raped, J.L. said "please at least use a condom," and she heard a sound like a wrapper, although she did not see or feel a condom. (Tr. 78.) J.L. confirmed that appellant's penis did slightly enter or penetrate her vagina without her consent but said that appellant could not maintain an erection, so he flipped her over and made her perform oral sex again until he ejaculated. J.L. testified that she could not move throughout the incident due to his body weight and that she feared for her life.

Appellant then pulled her skirt all the way down and her shirt up and threw her out of the car, which, in retrospect, J.L. believed to be an intentional strategy to distract her from observing his license plate. J.L. immediately called 911, the recording of which appellee played for the jury. J.L. identified her own voice as telling the operator that a guy she did not know physically grabbed her and dragged her into his car, put a box cutter to her throat, and raped her. The police arrived within minutes of her 911 call and took her to a nearby hospital, where medical staff conducted an examination and "rape kit" hours later. (Tr. 95.) J.L. stayed for the examination even though she was starting to feel withdrawal effects of not using drugs. She also confirmed that she told police she spit semen on the sidewalk but said it was raining, and they never found it. The following day, J.L. noticed bruising on her shoulders, neck, and back.

J.L. testified that she had been convicted three times for theft, which she said supported her former drug habit, and had been to jail. J.L. also confirmed that she initially lied to the nurse and police about why she was walking on the streets so early in the morning, telling them that she was going to get coffee rather than drugs, so she would not be judged or treated differently. According to J.L., she had been clean for nearly two years prior to testifying and currently held a job as a waitress while also caring for her baby.

Courtney Smigle, a nurse at the hospital where J.L. was admitted, testified that she participated in J.L.'s treatment, including determining her assault history, conducting a preliminary physical exam, and being present while a doctor performed her pelvic examination. According to Smigle, J.L. cried while describing the assault, which Smigle indicated on her assault history report as involving penetration of J.L.'s vagina by a stranger's penis and fingers and oral sex. The physical examination indicated points of tenderness on her neck, shoulders and chin, no injuries or pain on the sides of her body or mouth, and no bruising. Smigle testified that bruising, which is not visible quickly after an injury but develops over hours or days after the injury, is consistent with her experience and the assault history described by J.L.

Two forensic scientists at the Ohio Bureau of Criminal Investigation testified to conducting tests of J.L.'s rape kit. Malorie Kulp testified to testing the swabs in J.L.'s rape kit for the presence of semen. Kulp found no presence of semen on J.L.'s vaginal or anal swabs, but did find the presence of seminal fluid on her oral swabs. Katherine Hall testified to analyzing the presence of DNA

in J.L.'s rape kit. Hall found DNA profiles consistent with appellant in the oral swab and J.L.'s underwear and the presence of male DNA in the anal swab which could not be attributed to a certain person.

Tim Hedrick, a detective with the sexual assault unit of the Columbus police department, testified that he was the primary detective for the J.L case. Hedrick conducted an initial interview with J.L. at the hospital where he observed her appearing emotionally upset. Within an hour of the interview, he searched the location where J.L. stated she spit semen but did not find anything, which, based on his experience, did not surprise him. Hedrick did not find anything of evidentiary value collected from a search of appellant's apartment and described appellant as cooperative during an initial interview.

The second alleged victim, J.C., testified that appellant raped her in the early morning hours on April 18, 2013. After a night of using cocaine and heroin, the lat[t]er of which she was addicted to at the time, J.C. left a friend's house on South Central Avenue, a few blocks south of West Broad Street in Franklinton, between 4:30 and 5:00 a.m. She headed on foot to her brother's house on Chicago Avenue, approximately six blocks away to the north, in order to get a ride to a doctor's appointment. Right after she crossed Broad Street, a man, who[m] she identified as appellant, pulled up in a dark blue car and asked her if she needed a ride. She replied yes, got in the passenger seat of the car, and the two negotiated oral sex for $20. Appellant drove to the northern end of Wisconsin Avenue, near the railroad tracks.

J.C. engaged appellant in oral sex but discontinued and said she was done when appellant failed to maintain an erection. According to J.C., appellant grabbed her neck and put her head back in his lap and threatened to kill her if she hurt him. Thinking she had no choice, J.C. resumed giving appellant oral sex, but after about 20 seconds, she realized "it was about to get all bad" and made an attempt to get to the car door. (Tr. 381.) As soon as she moved, appellant started "hammering" her with a closed fist. (Tr. 381.) J.C. threw up her arms and tried to swing back. Appellant "wrestled" his way on top of her in a straddle position and leaned the passenger chair back while beating her head and grabbing her throat. (Tr. 383.) After placing his mouth on her breast, appellant flipped J.C. over and took her pants down. What J.C. thought to be appellant's finger penetrated her anus, and she felt fondling around her vagina, but could not recall if his fingers or penis penetrated her vagina. J.C. was able to retrieve a knife in her coat pocket,

stabbed backward toward appellant, and thought she struck him. The two fought over the knife, in the midst of which J.C. was able to unlock and open the car door. J.C. fell backwards out of the car onto the concrete with her pants still down. J.C. started to crawl, and appellant drove off with J.C.'s purse still inside the car. She made it to her brother's house but does not remember how.

J.C. testified that only the initial oral sex was negotiated for money and that she never consented to oral sex the second time or any other type of sex. According to J.C., she pled for her life during the incident, and appellant was "violent, very angry" and told her he was going to kill her. (Tr. 411.) J.C. confirmed that she was currently on probation for a felony of improper handling of a firearm in a motor vehicle.

D.C., J.C.'s brother, testified that around 5:00 a.m. on the morning of April 18, 2013, he discovered his sister sitting on his porch, looking like a "wreck" and repeatedly saying "[h]e tried to kill me." (Tr. 422.) Someone in the house called 911, the police quickly responded, and an ambulance took J.C. a nearby hospital.

Leslie Huber, a "SANE" nurse at the hospital specializing in treating sexual assault patients, testified to assessing J.C. at the hospital. (Tr. 243.) According to Huber, J.C. was cooperative but cried a lot and was disengaged. J.C.'s face was swollen and bruised around her eyes, cheeks, mouth, and forehead, and a CAT scan revealed she had a broken nose. Bruising called "petechiae," or bursting of blood vessels, appeared behind one ear, which Huber said was most often associated with a strangulation injury. (Tr. 286.) Bruising showed on her left arm, red and tender areas appeared on her shoulders and right breast, and abrasions presented on one hip, an arm, and her knees. Huber additionally documented redness on her buttock area which she agreed was caused by something abrasive, possibly concrete or pavement. Scratches marked J.C.'s face and neck. J.C. declined a pelvic examination and vaginal swab, which Huber testified was not uncommon for patients who experienced sexual assaults, but did allow an oral and anal swab to be taken for the rape kit.

Huber testified that J.C. told her that she had been physically and sexually assaulted in the passenger seat of a car by a stranger who punched her repeatedly in the face, choked her, put his mouth on her breast, put his penis in her mouth, flipped her over and held her down, and penetrated her vagina and anus with his fingers, which Huber testified to specifically seeking follow-up clarification on. Huber further testified that J.C. indicated that she fell out of the car

onto concrete. Huber documented J.C.'s statement in her "Assault History" report. (State's Exhibit N, 1.) According to Huber, it would "[a]bsolutely not" be unordinary for a victim of a sexual assault, particularly in a facedown position, to think she was assaulted with fingers, when later DNA results reveal the presence of semen. (Tr. 318.)

Two forensic scientists at the Ohio Bureau of Criminal Investigation testified to conducting tests of J.C.'s rape kit and swabs taken by police. Peter Tassi testified to finding trace amounts of semen on J.C.'s anal swab but did not find the presence of semen or seminal fluid on her oral swabs. No vaginal samples were present in the kit to examine. Steven Wiechman testified that insufficient data was available from the anal sample to be able to make a suitable DNA comparison to appellant but that the DNA profile from the right breast skin swab was consistent with appellant.

David Pelphrey, a sergeant in the special victims unit of the Columbus police department, testified to collecting DNA off of J.C. at the hospital and collaborating with detectives on J.C .'s case. Regarding development of the case, Pelphrey said that detectives working the J.C. and J.L. cases saw a pattern in the cases and were able to develop appellant as the suspect in both.

Mark Henson, a detective for the crime scene investigation unit of the Columbus police department, testified to executing search warrants for appellant's car and apartment. Within appellant's car, Henson testified to observing three knives in the storage pocket on the driver's side door panel, including a yellow box cutter and a black handled box cutter with its blade extended. Henson additionally observed a brown paper bag in the lidded console containing nine condoms and lubricant, a knife puncture or cut in the driver's seat, and several earrings. No DNA swabbings or fingerprint examinations were conducted on the car.

The state then admitted numerous exhibits, including 911 calls, maps, rape kit and forensic evidence and reports, physical evidence such as the box cutters, knife, and bag of condoms, and photographs depicting J.C. and J.L. at the hospital, appellant's car, and the condom bag. The photographs of appellant's car show it to be a four-door sedan with tinted windows, and the photograph of the brown paper bag depict[ing] a white label on its side stating "12 Condoms, 2 Lubricants." (State's Exhibit AA20, 1.) The state rested its case-in-chief. Appellant moved for a judgment of

acquittal under Crim.R. 29, which the court overruled. Appellant then testified on his own behalf.

Appellant testified that he did not kidnap or rape J .L. or J.C. and that sexual contact with them was a consensual, paid transaction. In April 2013, appellant worked as a maintenance person in a fast food restaurant in Franklinton, which required him to use box cutters everyday. He worked the 4:00 a.m. to noon shift but often arrived to work late. Although he no longer lived in Franklinton, he was familiar with the area from having previously lived there for 14 or 15 years.

Regarding the morning of April 8, 2013, appellant testified that he exited onto West Broad Street on his way to work for the purpose of soliciting sex. He saw a woman who he identified in court as J.L. standing on a corner with a black male and thought she was "working." (Tr. 564.) He turned on to Dana Avenue and then made his way to Princeton Avenue near Broad Street. According to appellant, he asked J.L. if she was working, and she got into his car. They negotiated oral sex for $20, and appellant stopped at a nearby bank to withdraw approximately $50 from the ATM. J.L. indicated for appellant to drive to North Princeton Avenue, and on the way, J.L. made a comment about the black box cutter clipped to his hip. Once in the location picked by J.L., appellant gave J.L. $20, and J.L. performed oral sex but complained that he was taking too long. Appellant promised her an additional $20 for her to continue. After he ejaculated, he gave her a napkin to spit in, told her he would not pay her the additional money, and asked her to exit the car. She refused, so he leaned across her, opened her door, and "slightly" pushed her out. (Tr. 582.) Appellant described her demeanor as "highly upset." (Tr. 582.) Appellant then continued on to work.

Appellant testified that he never forced J.L. into his car, never forced her to perform oral sex, never climbed on top of her or held her against her will, and never forced her to have sex. Appellant described his 2002 Chevy Cavalier as a "compact, small" car with the lever to recline the passenger seat located near the bottom of the passenger seat on the floor and additionally noted that, at the time, he weighed 234 pounds. (Tr. 582.)

Regarding the morning of April 18, 2013, appellant testified that on the way to work he stopped at a gas station on West Broad Street, where J.C. solicited him for sex and got into his car. Appellant gave her $20 to pay for oral sex, and J.C. indicated to drive to an alley near Wisconsin Avenue. Once there, J.C. allowed

him to kiss her breast and began to perform oral sex on appellant before jumping up and attempting to open the door, in what appellant thought to be an attempt to rob him of his payment for oral sex. Appellant caught her by her hair and held her while asking for the $20 back. J.C. instead drew a knife and stabbed at him, hitting his seat. He fought her, hitting her repeatedly, while telling her to drop the knife. Once he struck her face, she let go of the knife. Appellant took the $20 out of her pocket, pushed her out of the car, and drove to work. Once there, he noticed J.C.'s purse and her knife were still in his car. He put the purse in the trash compactor at work and put her knife in his console. Later on, while working, he retrieved the purse from the compactor and looked at her phone and wallet, learning her name. Appellant did not call the police about the incident.

Appellant admitted he assaulted J.C. but said he did so in a split second decision to avoid her knife. Appellant testified that he did not force her head down a second time to perform oral sex, never said that he would kill her, never got on top of her, which he said there was not enough room in his compact car to do, and never forced his fingers into her or had intercourse with her. Appellant testified that when detained by police on May 10, 2013, he answered all their questions without a lawyer present because he had nothing to hide.

On cross-examination, appellant confirmed that he solicited prostitutes approximately twice a week for the six months prior to the April 2013 incidents and that, when detained for the May 2013 interview, police told him multiple girls implicated him. When police provided him with photographs of three of those girls, he recognized and discussed J.C. and a third woman but did not recognize J.L. Appellant testified that he had not had vaginal sex with prostitutes for several years prior to the two incidents and explained that he picked up the bag of condoms and lubricant from the health department, along with some brochures, to make sure that his 14–year–old son would practice safe sex now that he was in high school. Appellant additionally insisted that he did not touch J.L.'s underwear, even though his DNA was found there, and that J.C.'s "pants never even came down in the car." (Tr. 604.) Regarding his box cutter, appellant denied that he had placed it into the door console in an open position, as the search photographs indicated. Appellant confirmed that he was five feet, eight inches tall and that his license stated he was 201 pounds.

Each party then rested its case. After deliberations, the jury found appellant guilty of two counts of kidnapping, in violation of R.C.

2905.01 with a sexual motivation specification under R.C. 2941.147, and guilty of four out of the five counts of rape under R.C. 2907.02. The court additionally found appellant guilty of the sexual predator specification attached to each count.

A sentencing hearing was held on March 10, 2015, after which the judge sentenced appellant to mandatory prison terms of ten years to life for each of the six counts. The judge ran the kidnapping charges and one count of rape concurrently with each other and to all other sentences in the case, while running the sentences for the three remaining rape counts consecutively to each other, for a total sentence of 30 years to life. Appellant received 669 days of jail-time credit. Appellant filed a timely appeal.

II. ASSIGNMENTS OF ERROR

Appellant raises the following three assignments of error for our review:

[1.] THE TRIAL COURT IMPROPERLY ADJUDICATED DEFENDANT A SEXUALLY VIOLENT PREDATOR WHERE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT SUCH DETERMINATION WAS WARRANTED.

[2.] THE TRIAL COURT ERRED BY ORDERING DEFENDANT TO SERVE A SENTENCE THAT IS CONTRARY TO LAW AND VIOLATIVE OF HIS DUE PROCESS RIGHTS.

[3.] THE VERDICT IS AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE.

*State v. Carroll*, Nos. 15AP-409, 15AP-410, 2015 WL 9593918, at *1-7 (Ohio App. 10th Dist. Dec. 24, 2015). On December 24, 2015, the appellate court affirmed the judgment of the trial court. *Id.* On May 4, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Carroll*, 145 Ohio St.3d 1460 (Ohio 2016). On March 23, 2016, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (ECF No. 5-1, PageID# 264.) On July 14, 2016, the appellate court denied the Rule 26(B) application. (PageID# 300.) Petitioner apparently did not file an appeal from that decision.

On May 4, 2017, Petitioner filed the *pro se Petition* pursuant to 28 U.S.C. § 2254. He asserts that the trial court improperly adjudicated him as a sexually violent predator (claim one); that his sentence is contrary to law because the trial court failed to consider the proportionality of his sentence as compared to other persons convicted of similar crimes (claim two); and that the evidence is constitutionally insufficient to sustain his convictions (claim three). Respondent contends that Petitioner's claims fail to warrant relief and are procedurally defaulted.

For ease of discussion, the Court will address Petitioner's claims out of order.

## Standard of Review

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("the AEDPA") establishes the standards governing this Court's review of state-court criminal judgments. The United State Supreme Court described the AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, —— U.S. ——, ——, 134 S.Ct. 10, 16 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) (The "AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

The factual findings of the state appellate court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). "Under [the] AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley*, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520–21,

(2003) (internal quotation marks omitted) (citing *Williams v. Taylor*, 529. U.S. at 409, and *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) ("'[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence.'" (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*))); *see also Nicely v. Mills*, 521 Fed.Appx. 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before it at the time that it rendered its decision. *Pinholster*, 563 U.S. at 181. Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id*. at 182.

### Sufficiency of the Evidence

In claim three, Petitioner asserts that the evidence is constitutionally insufficient to sustain his convictions. The state appellate court rejected this claim, reasoning in relevant part as follows:

> [A]ppellant asserts that insufficient evidence supports his conviction and that his convictions are against the manifest weight of the evidence. For the following reasons, we disagree.

Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id*. In determining whether the evidence is legally sufficient to support a conviction, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Robinson*, 124 Ohio St.3d 76, 2009–Ohio–5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough,* 95 Ohio St.3d 227, 2002–Ohio–2126, ¶ 79–80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP–668, 2009–Ohio–754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP–874, 2011–Ohio–1024, ¶ 42.

\* \* \*

Here, the jury convicted appellant of four counts of rape pursuant to R.C. 2907.02 for vaginal intercourse with both J.L. and J.C., for anal intercourse with J.C., and for oral sex with J.C. In relevant part, R.C. 2907.02(A)(2) states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" is defined, in pertinent part, as "vaginal intercourse between a male and female; anal intercourse, fellatio \* \* \* between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body \* \* \* into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). In this context, the vaginal opening includes the labia

majora. *State v. Gilbert*, 10th Dist. No. 04AP–933, 2005–Ohio–5536, ¶ 35–36.

The jury additionally convicted appellant of kidnapping with a sexual motivation specification under R.C. 2905.01 and 2941.147, respectively, for both J.L. and J.C. Pursuant to R.C. 2905.01(A), in pertinent part:

No person, by force [or] threat * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another;

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

A sexual motivation specification "charges that a person charged with a designated * * * kidnapping offense committed the offense with a sexual motivation." R.C. 2971.01(K). R.C. 2941.147(A) provides that whenever a person is charged with an offense that is a violation of R.C. 2905.01, the indictment may include a specification that the person committed the offense with a sexual motivation, and if the specification is included, must be stated in the indictment in a particular form. "Sexual motivation" is defined as "a purpose to gratify the sexual needs or desires of the offender." R.C. 2971.01(J).

Appellant first argues that because J.C. admitted that she voluntarily got into his car and performed oral sex that his rape and kidnapping convictions should not stand. However, "consent, if once given in fact, may be withdrawn," and appellant's argument ignores J.C.'s testimony that appellant restrained her liberty and compelled her to submit to additional sex acts by force or threat of force after her initial consent to oral sex. *State v. Freily*, 3d Dist. No. 9–97–19 (Dec. 5, 1997).

Although appellant additionally contends that no DNA evidence showed that he penetrated J.C., such DNA or physical evidence is not required for conviction. *State v. Peeples*, 10th Dist. No. 13AP–1026, 2014–Ohio–4064, ¶ 22; *State v. Kaufman*, 187 Ohio App.3d

50, 2010–Ohio–1536, ¶ 71 (7th Dist.) ("[T]here is no requirement that testimonial evidence of sexual abuse must be corroborated by physical or other evidence."). J.C. testified that appellant forced her to resume oral sex by grabbing her neck, threatening to kill her, physically stopping her from exiting the vehicle by punching and choking her, flipping her and getting on top of her, and fondling and penetrating her without her consent. The SANE nurse both testified and documented in her report that, on the day of the assault, J.C. reported both anal and vaginal penetration and engaged the nurse in a clarification of specifically where the penetration occurred. We find, after viewing the evidence in a light most favorable to the prosecution, that reasonable minds could reach the conclusion reached by the jury on this record. Therefore, sufficient evidence supports appellant's convictions for kidnapping with a sexual motivation and rape of J.C.

Appellant likewise argues against his convictions regarding J.L. due to a lack of DNA evidence. The state presented the testimony of J.L. that appellant grabbed her off the street, put her in his car, held his arm across her so should could not move, wielded an open box cutter, got on top of her and used his knee on her stomach and elbows on her back to hold her down in a way that she could not move, and choked her. J.L. further testified that appellant's penis entered or penetrated her vagina slightly, and Smigle's assault history report indicates that J.L. was vaginally penetrated. J.L. testified that the sexual conduct was not consensual. The testimonial evidence here, if found credible by the jury, is sufficient to support appellant's convictions for kidnapping with a sexual motivation and rape under a theory of vaginal intercourse for J.L.

***

[A]ppellant attacks the credibility of J.L. and J.C., stating they "had motivation to lie, because [appellant] shorted them their promised money," and they were known drug abusers and offenders. (Appellant's Brief, 27.) However, in assessing the weight of the evidence, "[t]he jury was permitted to believe or disbelieve any of the testimony presented, and we still must give deference to the jury's determination of the credibility of the witnesses." *Id*. at ¶ 83. The jury heard these theories and rejected them as reasons to insert reasonable doubt into the evidence of conviction. Further, J.L. and J.C. provided detailed testimony corroborated by J.L.'s 911 call, J.C.'s brother's testimony, and the hospital assessments. No material inconsistencies in their testimony was produced by appellant.

Further, while appellant had no prior criminal record, the record shows his own credibility to be questionable. Even in his own version of events, appellant admitted to reacting violently to J.C. trying to exit his car. Moreover, appellant's story at times was inconsistent with record physical evidence. For example, appellant insisted that the box cutter in his car was not open, even though the inventory of the car shows otherwise, and he attempted to explain his possession of a bag of condoms and lubricant in his car console, with some condoms and lubricant missing, as a safe sex precaution for his son. In addition, appellant insisted that he had only solicited oral sex from J.C. and J.L., but DNA consistent with appellant was found on J.L.'s underwear, and J.C.'s buttocks showed redness from an abrasive surface such as concrete. Although appellant points to a forensic expert's discussion about "touch DNA evidence," which we extrapolate to be presented as an explanation of the DNA evidence in J.L.'s underwear, the jury heard this testimony and was nonetheless unpersuaded to believe appellant's side of the story. (Appellant's Brief, 26.) Given this record and cognizant that the jury is in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as each witness's manner and demeanor, we find appellant's proffered credibility arguments deficient to reverse on manifest weight grounds. *Kaufman; Harris* at ¶ 25.

Finally, we disagree with appellant's assertion that appellee ignored and failed to demonstrate that it was physically possible for appellant to perform the alleged sexual assaults in his car. Appellee elicited testimonial evidence that appellant is five feet, eight inches tall and presented photographs of the car which showed it to be a four-door sedan. Most importantly, appellee presented the testimony of J.L. and J.C. that they were raped in the car, testimony strengthened by the similarities between their separate accounts.

\*\*\*

Accordingly, appellant's third assignment of error is overruled.

*State v. Carroll*, 2015 WL 9593918, at \*7-12 (footnote omitted).

To the extent that Petitioner raises a claim that his convictions are against the manifest weight of the evidence, this claim fails to present an issue appropriate for federal habeas corpus relief. *See Williams v. Jenkins,* No. 1:15cv00567, 2016 WL 2583803, at \*7 (N.D. Ohio Feb. 22,

2016) (citing *Nash v. Eberlin*, 258 Fed.Appx. 761, 765, n. 4 (6th Cir. 2007)); *Norton v. Sloan*, No. 1:16-cv-854, 2016 WL 525561, at *5 (N.D. Ohio Feb. 9, 2017)(citing *Ross v. Pineda*, No. 3:10-cv-391, 2011 WL 1337102, at *3 (S.D. Ohio)) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law.").

Under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses in order to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, Petitioner's claim that his convictions were against the manifest weight of the evidence cannot be considered by this Court.

However, before a criminal defendant can be convicted consistent with the United States Constitution, there must be evidence sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume—even if it does not appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson*, at 326).

Moreover, federal habeas courts must afford a "double layer" of deference to state court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Second, and even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *See White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This is a substantial hurdle for a habeas petitioner to overcome, and for the reasons discussed by the state appellate court, Petitioner has not done so here.

Construing all of the evidence in the light most favorable to the prosecution, and crediting the testimony of the alleged victims, as this Court is required to do, for the reasons discussed by the state appellate court, the evidence is constitutionally sufficient to sustain Petitioner's convictions. Claim three is without merit.

**Sexually Violent Predator Classification**

In claim one, Petitioner asserts that the State failed to provide sufficient evidence to support his adjudication as a sexually violent predator. Referring to *Leslie v. Randle*, 296 F.3d 518, 522-23 (6th Cir. 2002), Respondent suggests that this claim is not cognizable on habeas corpus review, because it does not relate to the fact or duration of Petitioner's confinement and because Petitioner is not "in custody" on his sexual predator adjudication so as to provide for habeas corpus relief. *Return of Writ* (ECF No. 5, PageID# 86-7). In other words, according to Respondent, Petitioner's adjudication as a sexual predator is simply a collateral consequences of

18

his conviction, and this Court therefore lacks jurisdiction to consider this claim. (PageID# 87-88).

This Court has previously rejected Respondent's argument in this regard:

> Respondent suggests that a challenge to a prisoner's conviction for a sexually violent predator specification is not cognizable in a federal habeas corpus review. *See Leslie v. Randle*, 296 F.3d 518 (6th Cir. 2002). However, that was not what the *Leslie* court held. In that case, the court considered whether a habeas petition was the proper mechanism by which to challenge the constitutionality of Ohio's statute requiring individuals convicted of certain crimes to register as sexual predators. *Id*. The Court held that because the statute on its own did not restrain the petitioner's liberty, but simply required him to register, it did not meet the "in custody prerequisite for habeas corpus review." *Id*. at 522.

*Durdin v. Warden, Mansfield Correctional Institution*, No. 2:16-cv-355, 2017 WL 1281418, at *16 (S.D. Ohio April 6, 2017) (addressing on the merits a petitioner's claim that the evidence was insufficient to support the sexually violent predator specification under O.R.C. § 2971.01(H)(1)). Moreover, *Leslie* involved O.R.C. § 2950 *et seq*., "which primarily addresses registration requirements for sex offenders with the intent of gathering, exchanging, and distributing information about sex offenders 'as a means of assuring public protection . . . .'" *Fisher v. Tibbals*, No. 1:11-cv-01262, 2014 WL 1365507, at *5 (N.D. Ohio March 31, 2014) (citing O.R.C. § 2950.02(B)). In this case, Petitioner challenges his adjudication as a sexually violent predator under O.R.C. § 2971, *et seq*., (*see* ECF No. 5-1, PageID# 161-64), "a statute which has a direct and mandatory impact on the sentence he received." *See Fisher v. Tibbals,* 2014 WL 1365507, at *5 (rejecting the argument that the petitioner was not "in custody" for purposes of 28 U.S.C. § 2254 in connection with a challenge to the application of O.R.C. § 2971 *et seq*.) (citing *Arias v. Hudson*, 589 F.3d 315, 317 (6th Cir. 2009)). Therefore, this Court will address the merits of this claim.

The state appellate court rejected Petitioner's claim as follows:

> [A]ppellant asserts that the trial court erred in adjudicating appellant a sexually violent predator because the state failed to prove beyond a reasonable doubt that the specification was warranted. We disagree.
>
> At trial, the state must prove, beyond a reasonable doubt, that a sexually violent predator specification applies to the offender. *State v. Haynes*, 10th Dist. No. 01AP–430, 2002–Ohio–4389, ¶ 92; *State v. Yoder*, 5th Dist. No.2011–CA–00027, 2011–Ohio–4975, ¶ 48. An appellate court reviews a challenge of the evidence to support a conviction of a sexually violent predator specification under the sufficiency and manifest weight standards used to review the predicate conviction. *Haynes* at ¶ 92, 96; *State v. Wooten*, 9th Dist. No. 13CA010510, 2014–Ohio–3980, ¶ 27–43.
>
> A "'[s]exually violent predator' means a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). Rape and kidnapping for the purpose of engaging in sexual activity against the victim's will are considered sexually violent offenses. R.C. 2971.01(L). R.C. 2971.01(H)(2) provides that:
>
> For purposes of division (H)(1) * * *, any of the following factors may be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses:
>
> (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
>
> (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
>
> (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

Appellant argues [that] many of these factors are not present in the case to support the finding that he is a sexually violent predator. Specifically, appellant points to having no criminal history of sexually oriented offenses, no documented history of sexually deviant behavior in his juvenile years, no proof [that] his behavior is chronic to a degree that it would be likely he would offend again, no proof [that] he behaved in a manner [that] should be construed as tort[urous] or ritualistic, and physical harm that he contends was unrelated to a sexual act. Appellant additionally argues that the court ignored the fact that [the] charges stemmed from consensual arrangements to receive oral sex.

In making its ultimate determination that there was, beyond a reasonable doubt, a likelihood that appellant will engage in the future in one or more sexually violent offenses, the trial court focused on the fact that there were multiple victims involved, that appellant's behavior escalated from solicitations to violent rapes, that evidence showed [that] appellant chronically committed offenses with a sexual motivation, and that at least in one instance the victim's life was in jeopardy due to the physical harm imposed by appellant. The court disagreed that the behavior was ritualistic but noted a pattern of behavior to take control over women.

We agree with the trial court. Available information or evidence suggests that appellant chronically commits offenses with a sexual motivation. Appellant admitted to a long history of soliciting sex with women who[m] he knew to be drug addicts. He solicited women for sex when he lived in Franklinton and for the six months prior to the attacks. Record evidence shows [that] he went beyond solicitation to holding multiple women, physically and by threats, for the purpose of raping them. Further, appellant beat J.C. severely and with no signs of abating until she fought back with a knife, putting her life in jeopardy. Moreover, we agree with the trial court that appellant's escalating violent behavior and pattern of subjugating women comprise relevant evidence tending to show "a likelihood that [appellant] will engage in the future in one or more

> sexually violent offenses." R.C. 2971.01(H)(2). Therefore, we find
> sufficient record evidence to support the specification and do not
> find appellant's conviction under the sexually violent predator
> specification to be against the manifest weight of the evidence.

*State v. Carroll*, 2015 WL 9593918, at *11-12.

This Court must defer to a state court's interpretation of its own laws. *Durdin*, 2017 WL 1281418, at *17 (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)). Again, when viewing all of the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia*, the record reflects constitutionally sufficient evidence to sustain Petitioner's adjudication as a sexually violent predator under O.R.C. § 2971.01(H)(1). Claim one is without merit.

## Sentencing

In claim two, Petitioner asserts that the trial court failed to consider proportionality in imposing sentence. Respondent contends that Petitioner has waived this claim by failing to present it to the state courts as an issue of federal constitutional magnitude. Instead, according to Respondent, Petitioner argued only that his sentence violated Ohio law. *Return of Writ* (ECF No. 5, PageID# 91-92).

In order to satisfy the habeas corpus exhaustion requirement, a petitioner must fairly present the substance of each constitutional claim to the state courts as a federal constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Although this "fair presentment" requirement is a rule of comity, not of jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999), the requirement is rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the state's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. In the Sixth Circuit, a petitioner can satisfy this "fair presentment" requirement in any one of four ways: (1) reliance upon federal cases employing

constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of federal constitutional law or in terms sufficiently particular to allege a denial of a specific federal constitutional right; or (4) alleging facts well within the mainstream of federal constitutional law. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000). However, general allegations of the denial of a constitutional right, such as the right to a fair trial or to due process, are insufficient to satisfy the "fair presentment" requirement. *Id.*

The record reflects that Petitioner argued on direct appeal that his sentence was "contrary to law" and violated his due process rights. *See Appellant's Amended Brief* (ECF No. 5-1, PageID# 140). Specifically, Petitioner argued that the trial court, in imposing sentence, had violated state law when it failed to engage in an evaluation of the proportionality of Petitioner's case when compared to those of others similarly convicted. (PageID# 166). Petitioner did not refer to any federal cases or state cases relying on federal law in support of this claim. The state appellate court likewise reviewed the claim only for an alleged violation of state law:

> [A]ppellant asserts that the trial court erred in failing to engage in evaluating the proportionality of his case and cases of those people similarly convicted, in violation of R.C. 2929.11 and 2929.14. We disagree.
>
> An appellate court "review[s] felony sentences to determine whether clear and convincing evidence establishes that the sentence is contrary to law." *State v. Price*, 10th Dist. No. 13AP–1085, 2014–Ohio–4065, ¶ 6. "Applying that standard, we look to the record to determine whether the sentencing court considered and properly applied the statutory guidelines and whether the sentence is otherwise contrary to law." *State v. Reeves*, 10th Dist. No. 14AP–856, 2015–Ohio–3251, ¶ 4.
>
> R.C. 2929.11(B) sets forth consistency and proportionality requirements for sentencing, "requir[ing] that sentencing courts impose punishment and sentence 'consistent with sentences imposed for similar crimes committed by similar offenders.'" *Id.* at ¶ 6, citing R.C. 2929.11(B). We recently explained that the

consistency and proportionality requirement "does not necessarily mean uniformity." *Id*.

Instead, consistency aims at similar sentences. Accordingly, consistency accepts divergence within a range of sentences and takes into consideration a trial court's discretion to weigh relevant statutory factors. Although offenses may be similar, distinguishing factors may justify dissimilar sentences. *State v. Worth*, 10th Dist. No. 10AP–1125, 2012–Ohio–666, ¶ 98, *quoting State v. Battle*, 10th Dist. No. 06AP–863, 2007–Ohio–1845, ¶ 24. Thus, consistency in sentencing does not derive from a case-by-case comparison, but by the trial court's proper application of the statutory sentencing guidelines. *State v. Hall*, 179 Ohio App.3d 727, 2008–Ohio–6228, ¶ 10 (10th Dist.). In order to demonstrate that a sentence is inconsistent, an offender must demonstrate that the trial court did not properly consider applicable sentencing criteria found in R.C. 2929.11 and 2929.12. *Worth* at ¶ 99, citing *State v. Holloman*, 10th Dist. No. 07AP–875, 2008–Ohio–2650, ¶ 19.

*Id. See also State v. Hall*, 179 Ohio App.3d 727, 2008–Ohio–6228, ¶ 10 (10th Dist.).

Further, where the trial court's judgment entry states that it considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the factors in R.C. 2929.12, an appellant's claim that the trial court failed to consider consistency and proportionality of his sentence to other cases involving the same charges fails. *Reeves* at ¶ 7.

R.C. 2929.14(C)(4) addresses disproportionality in the context of a trial court's imposition of consecutive sentences, stating, in pertinent part, "[i]f multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds * * * that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public."

Here, the trial court stated in the judgment entry that it "considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the factors set forth in R.C. 2929.12." (Mar. 16, 2015 Judgment Entry, 3.) As a part of the sentencing hearing and in its judgment entry, the trial court stated that appellant's sentence was "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public" in considering

the imposition of consecutive sentences under R.C. 2929.14. (Mar. 16, 2015 Judgment Entry, 3.) As such, the trial court considered proportionality and consistency in sentencing as required by law for this case. It was not required under law to compare appellant's case to those similarly convicted, as appellant suggests. *Id.* at ¶ 6. Therefore, clear and convincing evidence does not establish that appellant's sentence is contrary to law.

Accordingly, appellant's second assignment of error is overruled.

*State v. Carroll*, 2015 WL 9593918, at *12-13. Petitioner did not fairly present this claim to the state courts as one of federal constitutional magnitude. Further, Petitioner has failed to establish cause for this failure. He has therefore waived this Court's review of this claim.

To the extent that Petitioner raises a claim regarding the alleged violation of state law, this claim does not provide a basis for relief. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). "State courts [], after all, are the final arbiters of the state law's meaning and application and the federal habeas court is not the appropriate forum to adjudicate such issues." *Moreland v. Bradshaw*, 635 F.Supp.2d 680, 705 (S.D. Ohio April 10, 2009) (citing *Summers v. Leis*, 368 F.3d 881, 892 (6th Cir. 2004)). It is only where the alleged error resulted in the denial

of fundamental fairness that habeas relief will be granted. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Such are not the circumstances here.

## Recommended Disposition

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

                                       *s/ Norah McCann King*
                                       Norah McCann King
                                       United States Magistrate Judge

February 20, 2018